NelsON, J.,
delivered the opinion of the Court.
Although there is some conflict in the evidence in this case, we are satisfied from the proof, that, however successful the complainant may have been in dissembling his sentiments for a time, he was, during the late civil war, a Union man; that the defendants were fully identified, in sentiment and feeling, with the late rebellion; that complainant held a note on defendants, Wade and Love, for about $200, bearing date, 6th March, 1862; and that he surrendered- this note under duress, as charged in his bill. It seems that, acting under this influence, complainant received Confederate Treasury notes in payment, after having refused, on several occasions, to do so, upon the assurance of W. L. Gregg, now deceased, that he would borrow one hundred and fifty dollars of the amount; that he took the note of said Gregg for that sum, with Hubert A. Gregg as security, bearing *371 date the 30th March, 1863; that he sued the security for said amount, before a Justice; and having only recovered eighty-seven dollars, appealed to the Circuit Court of Wilson, where the same was pending when this bill was filed. Wade, the original debtor, was, at the time of this pretended payment, a soldier in the Confederate army, absent in the service; and Love, who was a joint maker of the note with him, and Mrs. Wade, acted in concert in compelling him to take the Confederate notes.
Several persons living in the- same county in which the'parties resided, had been previously arrested by the Confederate military authorities for refusing to receive Confederate Treasury notes; and among others, one witness states that in January, 1863, he was arrested by a squad of ten or more men, and taken sOme seventy-five or eighty miles, to General Morgan's headquarters, at McMinnville, where he was released, on condition that he would agree to take Confederate money in payment of all debts, and return home and inform the people that they would be compelled to receive it. General Morgan told the witness that he, Morgan, was 'acting under the orders of General Bragg, and that the penalty for refusing to take Confederate money would be a fine of five hundred dollars and compulsory ser vice, in the army, or imprisonment.
Witness, after his return home, gave publicity to this information, at a public sale, when about two hundred persons were present; and we have no doubt, from this and other evidence contained in the record, that complainant was fully informed of the military order before *372 be surrendered the note. One witness states that defendant, Love, in the course of the conversations which preceded the surrender of the note, said tfyafc if it was his own debt, he would not force the Confederate money on complainant, but that he was acting for Mrs. Wade. He said, further, that he would not be surprised if the cavalry should get after him. Love then left, for the purpose of consulting with Mrs. Wade, and while he was gone, W. L. Gregg said that complainant would be arrested and taken off if he did not take it. Before starting to Mrs. Wade’s, Love had requested complainant ■to receive the Confederate money; and when complainant’s daughter observed to him that he ought to pay her father in as good money as he had loaned to him, he replied, in complainant’s hearing, that he had told the soldier from whom lie received it that he did not expect complainant would take it, and that the soldier had answered, “All you have got to do is to let me know it, and I will make him take it.” Love returned, and stated to complainant, that Mrs. Wade, who is his daughter, said that if ho did not take the money, she would report him before night. Another witness states that while Love was gone to consult Mrs. Wade, Gregg stated to complainant, that “he had better take tbe money; for Love had said that be would have bim reported, sent to Morgan, and bound in a bond for $600, and imprisoned five months, if he did not take it, and he might be killed, as he was a Union man.” Complainant then agreed to receive it, and sent his son and Gregg to Mrs. Wade with the note.
On the day the note was surrendered, or the succeed *373 ing day, Mrs. Wade, who had paid the Confederate notes to complainant’s son, declared to a witness, that if her uncle, the complainant, had not taken the Confederate money, “she would have had Morgan’s men on him before night.” Love, soon afterwards, declared that complainant “hated to take Confederate money, pretty bad; that he was such a Lincolnite, and hated Confed. so bad, he loved to pack it on him.” One of defendant’s witnesses stated, upon cross-examination, and without objection, that complainant said, soon after he surrendered the note, that he “believed he would have been arrested and taken off if he had not received the Confederate money.” Mrs. Wade, who is the sister of complainant, and of James McCartney, another witness, compelled McCartney, the witness, to take Confederate money in payment,of a debt due. him from her husband, at about the same time when the note spoken of in this case was surrendered; and the witness states in substance, that he would not have taken it but from fear, and “because the woods was full of cavalry.” Love, in speaking to another witness in regard to the surrender of the note, said that, “if complainant cut up at that, he, the witness, had another dose for him.” . It further appears in evidence, that the “Confederate money” was very greatly below par; that complainant-refused, repeatedly, to receive it; that he finally consented to do so, only upon the assurance of Gregg that he had use for it, and would borrow a part of it, and under the pressure of immediate threats, which, under the circumstances then existing, could arid probably would have been immediately carried into execution.
*374 It is not necessary, in the view of a court of equity, to show that a party acted under the influence of extreme terror in making a contract. If he acted under threats or apprehensions, short of duress, but under such circumstances as to show that he was not a free agent, and was unable to protect himself, the contract will be annulled. See 1 Story Eq., § 239.
The complainant did not act under a vague and general apprehension of giving offense to the Confederate authorities, which may have been common to all the citizens, but with knowledge that a strong military order had been issued, and enforced by arrests in the section of country where he lived, and under the immediate pressure of personal threats, and a zealous and active combination against him, which he was powerless to resist. It was not necessary that he should express his fears at the time, as the expression of them might have brought about an immediate arrest.
Duress, or the want of free agency, like any other fact, may be established by circumstantial testimony; and no importance can be attached to the complainant’s declarations, made soou after the contract, and while the military order and the power to enforce it were still in existence, in the presence and hearing of persons from whom he differed in opinion, to the effect that he had acted voluntarily, as it may be fairly inferred, from all the circumstances, that these declarations were made to allay suspicion, and under the same influences of fear and apprehension under which he had previously acted; and there is no evidence in the record to show that his mind had been disabused of these impressions when *375 tbe declarations were made. There are slight discrepancies and apparent contradictions in the evidence of some of the witnesses, but not more than are usual in all cases of a controverted nature. They are not sufficient •to show that any witness in the case has committed perjury, and furnish nothing more'than an illustration of “substantial truth, with circumstantial variety.”
The complainant is, therefore, entitled to a decree declaring that the note was surrendered under duress; but is not entitled to the specific relief granted by the Chancellor, for the reason that ' he did not return, or offer to return, the Confederate - notes. It is in proof that, on the day after they were received by complainant, AV. L. Gregg borrowed one hundred and fifty dollars of the notes which had,-'Been paid, but refused to pay interest, and executed his. note, with security, payable one day after date, without- interest. The note is not in evidence, and no copy of it is contained in the record; but it is in proof that Gregg desired to obtain the loan, to enable him to pay a debt he owed to Isaac Gibson. One witness states;? that he promised to pay complainant “in tbe currency of the country at the close of the war, and in gold and. silver, if that was the currency of 'the country;” and declared that the money would answer him the same purpose as gold and silver.
Another witness says that 'Gregg remarked, he would take the Confederate money and - risk it, and another witness states that complainant said Gregg was to pay the note “in the currency of the country, when it was paid.”
Gibson proves that, in the*Spring of 1863, Gregg paid him one hundred dollars in’Confederate money; and from *376 the fact that he never made any complaint in regard to the transaction, taken in connection with his previous declarations, it may be inferred that he did not sustain the slightest loss upon the Confederate notes.
It was decided by the Supreme Court of the United States, in Thorington v. Smith, 8 Wal., 13, that contracts between the inhabitants of- the Confederate States, made during the late civil war, must be interpreted and enforced with reference to the condition of things created by the insurgent governing power; and that where a note was executed, payable in dollars, parol proof may be admitted to show the sense in which the word “dollars” was nsed, and that if “Confederate dollars” were meant, the plaintiff could only recover their value at the time n place of the contract.
We are, therefore, of the opinion, that, as W. L. Gregg realized the full value of the Confederate money he borrowed, and promised to pay in the currency that might prevail at the close of the war, his administrator, and Robert A. Gregg, the security, should be required to pay the amount of said note, with interest from the time the suit at law was commenced. And as all' the facts are substantially stated in the bill, and all the parties were brought before the Court, and complete justice can be done in this case, on the prayer for discovery and general relief without the further prosecution of the suit at law; and as the evidence shows that the complainant did not return the Confederate notes retained by him; let a decree be pronounced in his favor, against James Wade and Ar-mistead A. Love, for the amount due on their note to complainant, after deducting therefrom the sum of one *377 ’hundred and fifty dollars, an'd the actual value of the Confederate notes retained- by complainant at the time when the same were received, as to which the Master will state an account and make a report during the present term. Decree, further, that complainant recover of • -the administrator of W. L. Gregg- and Robert A. Gregg, the security, the sum of one hundred and fifty dollars with interest thereon from the commencement of the suit at law; that the suit at law 'shall be dismissed at their cost; and that the costs of this cause, in this court and the court below, shall be paid, one-half by the said Wade and Love, and the other half by said administrator and his security, but to be paid by Said administrator, if the same can be collected, out of any assets in his hands, and if not, then by said surety.
The Chancellor’s decree will be^ modified accordingly.